1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| JEFFRY LEVIN,<br><br>              Plaintiff,<br><br>       v.<br><br>CAVIAR, INC.,<br><br>              Defendant. | Case No.  15-cv-01285-EDL<br><br>**ORDER ON MOTION TO COMPEL INDIVIDUAL ARBITRATION AND MOTION TO DISMISS**<br><br>Re: Dkt. No. 24 |

12   I.     **INTRODUCTION**

13              This matter involves a putative class action as well as a representative action under the

14   California Private Attorneys General Act of 2004 (PAGA) (Cal. Lab.Code, § 2698 et seq.) brought

15   by Plaintiff on behalf of himself and others similarly situated against Defendant Caviar, Inc. d/b/a/

16   Try Caviar. FAC at 1, ¶¶ 34-36. Before the Court is Defendant's Motion to Compel Individual

17   Arbitration and Motion to Dismiss.  For the following reasons, the motion is GRANTED as to

18   Defendant's individual claims.  The Court, however, defers ruling on the issue of whether

19   Plaintiff's PAGA claim is arbitrable until the Court has received additional briefing from the

20   parties.

21   II.    **BACKGROUND**

22              The First Amended Complaint alleges that Defendant is a "San Francisco-based food

23   delivery service, which provides food delivery services in cities throughout the country via an on

24   demand dispatch system" (the "Caviar Platform). FAC ¶ 8.  Customers may request a courier to

25   pick up and deliver food from local restaurants using a smartphone application or via Defendant's

26   website. FAC ¶9.  Couriers are paid a fee for each delivery they complete as well as a percentage

27   of the cost of the food order and any tip the customer adds.  FAC ¶10.

28              The First Amended Complaint alleges that Defendant misclassified Plaintiff and other

United States District Court
Northern District of California

1    similarly situated couriers as independent contractors and, in so doing, violated provisions of the

2    California Labor Code that require the employer to pay certain employee expenses (Cal. Labor

3    Code §2802) and to provide itemized wage statements (Cal. Labor Code §226(a)).  FAC ¶2.

4            Plaintiff applied to become a courier for Defendant in early December 2014.  Velasquez

5    Decl. ¶ 8.  The general application process for Plaintiff and other couriers in San Francisco

6    involved a group orientation session called an "onboarding session."  Id. at ¶ 3.  Plaintiff attended

7    an onboarding session on December 15, 2014, where, among other things, the Courier Terms and

8    Conditions Agreement was describedId. at ¶ 8.  The next day, a Caviar Logistics Associate sent

9    Plaintiff an email that informed him that "[a]s noted in our onboarding session, I need you to

10   please complete our Caviar Onboarding Form, which takes only a few minutes and contains your

11   copy of the 'Courier Terms and Conditions' we reviewed during training."  Id., Exh. D.  This

12   email provided Plaintiff with a link to the web-based Caviar Onboarding form, which in turn

13   contained a hyperlink to the Caviar Courier Terms and Conditions.

14           Plaintiff was required to and did check a box that "signif[ied] that [he] reviewed,

15   unders[ood] and agree[d] to the Courier Terms and Conditions."  Id. at Exh. A.  The Courier

16   Terms and Conditions includes the following language.  The first sentence of this paragraph is in

17   the same type as the rest of the agreement, while the rest of the paragraph is in slightly larger type.

18

19          15.5 This Agreement is governed by laws of the State of California,
            without reference to conflicts of laws principles.
            Courier and Caviar agree that any disputes between them arising
20          from Courier's agreement, services, or other relationships with
            Caviar shall be subject to final and binding arbitration before the
21          American Arbitration Association ("AAA"). Such arbitration shall
            be conducted before a single, neutral arbitrator, pursuant to the
22          applicable AAA rules but provide for discovery and remedies which
            would otherwise be available under applicable state or federal law.
23          Such arbitration shall be conducted within the court
            jurisdiction within which the Courier primarily provides services to
24          Caviar. Caviar shall pay for any arbitration fees, except that Courier
            shall pay that portion of the arbitration filing fee which is equal to or
25          less than the amount charged by applicable state court for filing a
            civil complaint. Each party shall pay their own attorneys' fees
26          incurred in the arbitration, except as provided by applicable state or
            federal law. Courier and Caviar agree that neither will bring any
27          action on behalf of any party other than themselves, and specifically
            will bring no collective or class action against each other. This
28          clause expressly precludes Courier and Caviar from bringing a civil

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

court action against the other party on behalf of themselves or any
other person or entity, except where immediate injunctive relief is
necessary to protect property or safety.

Id. at Ex. C.

Plaintiff made his first delivery on the Caviar Platform on December 16, 2014.  A few

months later, Plaintiff downloaded an update to the Caviar application on his smartphone and at

that time again agreed to the Courier Terms and Conditions, which included an identical

arbitration provision.  Id. at ¶ 6-8, Reiss Decl. ¶¶ 6-7, 9-12.

On March 19, 2015, Plaintiff filed a putative class action complaint against Defendant.

Dkt. No. 1.  On May 27, 2015, he amended the Complaint and added a PAGA claim.  Dkt. No. 19,

FAC at 7.  Defendant then filed this Motion to Compel Individual Arbitration and Motion to

Dismiss.  Defendant argues that all of Plaintiff's claims fall within the mandatory arbitration

provision of the Courier Terms and Conditions and, therefore, this Court should compel Plaintiff

to individually arbitrate his claims and dismiss this action.

Plaintiff makes four arguments in opposition to the Motion to Compel Arbitration. First, he

contends that he is a "transportation worker engaged in interstate commerce" and as such falls

under an exception to the Federal Arbitration Act ("FAA") set out in 9 U.S.C. § 1.  Opp'n at 5.

Second, he argues that the PAGA waiver in the Courier Terms and Conditions is unenforceable.

Opp'n at 19.  Third, he contends he did not actually agree to the arbitration provision because it

was part of an invalid "clickwrap agreement."  Fourth, he argues the arbitration agreement is

unconscionable and therefore unenforceable.  Opp'n at 20-21.

III.    **LEGAL STANDARD**

The Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction

involving commerce to settle by arbitration a controversy thereafter arising out of such contract or

transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law

or in equity for the revocation of any contract."  AT & T Mobility LLC v. Concepcion, 563 U.S.

333, 131 S.Ct. 1740, 1745 (quoting 9 U.S.C. § 2).  The FAA thus makes clear that "courts must

place arbitration agreements on an equal footing with other contracts."  Id.  In deciding whether a

dispute is arbitrable, courts must consider: (1) whether a valid agreement to arbitrate exists; and

3

United States District Court
Northern District of California

1    (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. Chiron Corp.

2    v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000).  If a party seeking to compel

3    arbitration establishes these two factors, the court must compel arbitration.  Dean Witter Reynolds

4    Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of

5    discretion by a district court, but instead mandates that district courts shall direct the parties to

6    proceed to arbitration on issues as to which an arbitration agreement has been signed.") (emphasis

7    in original).  When a contract contains an arbitration clause, there is a presumption of arbitrability

8    such that doubts should be resolved in favor of coverage.  AT&T Techs. v. Commc'ns Workers of

9    Am., 475 U.S. 643, 650 (1986).  This presumption is particularly strong in the case of broad

10   arbitration clauses.  Id.  Where a contract delegates the question of arbitrability to an arbitrator, the

11   court's inquiry is limited to whether the demand for arbitration is "wholly groundless."  Clarium

12   Capital Management LLC v. Choudhury, 2009 WL 331588, at *5 (N.D.Cal. Feb. 11, 2009).

13         Generally applicable contract defenses, such as fraud, duress, or unconscionability, apply

14   to arbitration agreements.  Concepcion, 131 S.Ct. at 1746 (citing Doctor's Assocs., Inc. v.

15   Casarotto, 517 U.S. 681, 687 (1996)).  "Under California law, courts may refuse to enforce any

16   contract found 'to have been unconscionable at the time it was made,' or may "limit the

17   application of any unconscionable clause.'  Cal. Civ.Code Ann. § 1670.5(a) (West 1985).  A

18   finding of unconscionability requires 'a "procedural" and a "substantive" element, the former

19   focusing on "oppression" or "surprise" due to unequal bargaining power, the latter on "overly

20   harsh" or "one-sided" results.' [Citations.]"  Concepcion, 131 S. Ct. at 1746.  Although a finding

21   of unconscionability requires a showing of both procedural and substantive unconscionability,

22   they "need not be present in the same degree."  Armendariz v. Found. Health Psychcare Servs.,

23   Inc., 24 Cal. 4th 83, 114 (2000) ("'Essentially a sliding scale is invoked which disregards the

24   regularity of the procedural process of the contract formation, that creates the terms, in proportion

25   to the greater harshness or unreasonableness of the substantive terms themselves.'" (quoting 15

26   Williston on Contracts (3d ed. 1972) § 1763A, pp. 226–227))."

27

28

                                                        4

United States District Court
Northern District of California

1

IV.    **DISCUSSION**

2

A.    **FAA Exemption for Transportation Workers Engaged in Interstate Commerce Under 9 U.S.C. § 1**

3

Plaintiff first contends that the Motion to Compel arbitration should be denied because he

4

falls within the FAA exemption for "contracts of employment of seamen, railroad employees, or

5

any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1, see also

6

Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001).

7

In arguing that he and other delivery drivers were "engaged in interstate commerce,"

8

Plaintiff cites a number of cases that establish that delivery drivers may fall within the definition

9

of "transportation workers" and can, therefore, be exempt from the FAA. See, e.g., International

10

Broth. Of Teamsters Local Union No. 50 v. Kinestra Precast, LLC, 702 F.3d 954, 957 (7th Cir.

11

2012) (truckers transportation workers within the meaning of § 1 of the FAA). Further, even

12

occasional interstate transportation can trigger this exemption. Id. Plaintiff also cites cases that

13

hold that employees who oversee the transportation of goods in interstate travel may fall within

14

the scope of this exception. See Palcko v. Airborne Express, Inc., 372 F.3d 588, 594 (3rd Cir.

15

2004) (supervisor who did not himself deliver packages but monitored the performance of delivery

16

drivers who facilitated interstate deliveries exempt from FAA was a transportation worker

17

engaged in interstate commerce); Zamora v. Swift Transp. Co., 2008 WL 2369769, *6 (W.D. Tex.

18

June 3, 2008) (manager who did not engage in delivering goods was nevertheless exempt under §1

19

because his job was "critical to the operation of the trucks, the trucking terminal and the trucking

20

company," which operated in interstate commerce.) Finally, Plaintiff asserts that that it does not

21

matter whether a transportation worker transports goods on behalf of his employer or does so on

22

behalf of a third party; so long as the transportation worker drives across state lines he is "actually

23

engaged in the movement of goods in interstate commerce." Circuit City, 532 U.S. at 112.

24

Plaintiff, however, has not shown that he or any other similarly situated delivery driver

25

ever made trips across state lines. In other words, Plaintiff has not shown that his deliveries to San

26

Francisco Bay Area customers of food prepared by San Francisco Bay Area restaurants constitute

27

"engaging in interstate commerce."

28

Plaintiff nonetheless contends that he was "engaged in interstate commerce" because he

5

1    and couriers like him "facilitate the transportation of food that may have originated, or been

2    prepared, across state lines to customers at their homes and businesses" and "[b]y delivering food

3    orders to consumers, the couriers serve as the final step in the flow of food items in interstate

4    commerce." Opp'n at 6.  However, the cases on which Plaintiff relies do not support his position.

5    In Palcko, 372 F.3d at 592-93, the court held that an Airborne employee who was not herself a

6    driver, but who monitored the performance of truck drivers who delivered packages, including to

7    and from the airport for shipping around the country, was a transportation worker engaged in

8    interstate commerce because her work "was so closely related to interstate and foreign commerce

9    as to be in practical effect part of it." Id. at 593.  In Christie v. Loomis Armored US, Inc., 2011

10   WL 6152979 at *3, the court noted that in the case before it the employer was "registered with the

11   Department of Transportation and identifies itself as engaged in the business of interstate transport

12   of currency."  Further, the employee's job was to "transport currency, a good that is undisputedly

13   in the stream of interstate commerce." Id.  In finding that the employee was a transportation

14   worker exempt from the FAA, the Christie court appears to have relied on the Palcko court's

15   description of "engaged in commerce" as work "so closely related to interstate and foreign

16   commerce as to be in practical effect part of it." Palcko, 372 F.3d at 593.  Here, by contrast,

17   Defendant does not identify itself as being engaged in the interstate transport of goods, as the

18   employer in Christie did, nor are the prepared meals Plaintiff delivers a type of good – like

19   currency – that is "indisputably" part of the "stream of commerce.

20   Defendant points out that Plaintiff seeks a broad reading of the term "engaged in interstate

21   commerce," while courts have consistently held that this term should be narrowly construed.  The

22   Supreme Court in Circuit City, 532 U.S. 105, considered whether a Circuit City employee who

23   was a sales counselor in a store in Santa Rosa, California fell with the §1 exemption.  The Court

24   concluded he did not, noting that "[m]ost Courts of Appeals conclude the exclusion provision is

25   limited to transportation workers, defined, for instance, as those workers 'actually engaged in the

26   movement of goods in interstate commerce.' " Id. at 112 (citing Cole v. Burns Int'l Security

27   Servs., 105 F.3d 1465, 1471 (D.C.Cir.1997)).   Section § 1 of the FAA narrowly is read narrowly

28   in order to give effect to Congress's intent to "compel enforcement of arbitration agreements in

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    response to then-prevalent judicial hostility toward such agreements, especially given the fact that

2    more specific and comprehensive federal arbitration procedures for seamen and railroad

3    employees were already in existence or on the verge of passage." Palcko v. Airborne Express,

4    Inc., 372 F.3d at 592-93 (citing Circuit City, 532 U.S. at 121).  The Circuit City court also

5    emphasized the limited reach of the phrase "engaged in commerce," which covers "only persons

6    or activities within the flow of interstate commerce," Circuit City, 431 U.S. at 117, in contrast to

7    the terms "affecting commerce" or "involving commerce," which indicate Congress' intent to

8    regulate to the outer limits of its authority under the Commerce Clause." Id.  In International

9    Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC, 702 F.3d 954, the court

10   drew a contrast between § 2 and § 1 of the FAA.  Section 2 broadly reaches any contract

11   "evidencing a transaction involving commerce," while § 1 contains a more narrow exemption for

12   "transportation workers," limited to those actually engaged in interstate commerce.  See also

13   Circuit City, 532 U.S. at 112, 114 ("basic coverage authorization under § 2 of the Act" broader

14   than "exemption from coverage under § 1").

15          Courts have held that workers such as chefs involved in the preparation of food are not

16   "engaged in commerce," even if the ingredients may have been part of the "stream of commerce."

17   See Si v. CSM Inv. Corp., 2007 WL 1518350 (N.D. Cal. May 21, 2007); Lopez v. Top Chef Inv.,

18   Inc., 2007 WL 4247646 (S.D. Fla. Nov. 30, 2007).  Although these cases involved the Fair Labor

19   Standards Act rather than the FAA, they do provide guidance on the term "engaged in commerce."

20   As the Si court put it: "The mere fact that the food may have passed in interstate commerce prior

21   to arriving at the restaurant does not mean that the Plaintiff was engaged in commerce.  In a

22   California state case, the court of appeal held that "[g]oods arriving from out of state that are

23   unloaded and held in a warehouse before being loaded onto trucks and delivered to customers do

24   not terminate their interstate journey if 'there is a practical continuity of movement of the goods

25   until they reach the customers for whom they are intended.' " Bell v. H.F. Cox, Inc., 209 Cal. App.

26   4th 62, 77 (2012) (quoting Walling v. Jacksonville Paper Co., 317 U.S. 564, 568 (1943)).

27   Ingredients contained in the food that Plaintiff ultimately delivered from restaurants ended their

28   interstate journey when they arrived at the restaurant where they were used to prepare meals.

1      Further, a number of courts have held that local delivery drivers do not fall within the

2   transportation exemption to the FAA.  In <u>Hill v. Rent-A-Center, Inc.</u>, 398 F.3d 1286, 1289-90

3   (11th Cir. 2005), the Eleventh Circuit distinguished between a transportation worker engaged in

4   interstate commerce and the "activities of an interstate traveling pharmaceutical salesman who

5   incidentally delivered products in his travels, or a pizza delivery person who delivered pizza

6   across a state line to a customer in a neighboring town."  Similarly, in <u>Veliz v. Cintas Corp.</u>, 2004

7   WL 2452851 at (N.D. Cal. Apr. 5, 2004) *3, the court emphasized the narrow scope of the term

8   "engaged in interstate commerce" when it rejected plaintiff's effort to broadly construe that term,

9   which if accepted would overbroadly "include every employee from a trucker for a grocery store

10  to a pizza deliveryman."

11      Courts also look to "whether a strike by the category of workers at issue would interrupt

12  interstate commerce" in determining whether a worker falls within the FAA exemption.  <u>Lenz v.</u>

13  <u>Yellow Transp., Inc.</u>, 431 F.3d 348, 352 (8th Cir. 2005).  The policy behind the FAA exemption

14  for transportation workers engaged in interstate commerce is that it reach those workers who

15  would, by virtue of a strike, "interrupt the free flow of goods to third parties in the same way that a

16  seamen's strike or railroad employee's strike would."  <u>Veliz</u>, 2004 WL 2452851 at *10.  Here, a

17  strike by local delivery drivers such as Plaintiff would not have such an impact.

18      In sum, Plaintiff's argument that local delivery drivers are "engaged in interstate

19  commerce" asks this Court to adopt a broad reading of that term, despite the fact that the Supreme

20  Court has made clear that this term must be narrowly construed.  The Court declines to do so

21      Finally, Plaintiff also argues that he is an employee as opposed to an independent

22  contractor.  The Court need not reach this issue because Plaintiff was not "engaged in interstate

23  commerce" in his local delivery work for Defendant.

24  **B.      PAGA Waiver**

25      The Caviar Courier Terms and Conditions agreement precludes Plaintiff from pursuing a

26  representative claim under the PAGA.[1]  In <u>Iskanian v. CLS Transp. Los Angeles, LLC</u>, 59 Cal. 4th

27

28  [1]      Specifically, it provides:  "Courier and Caviar agree that any disputes between them arising
from Courier's agreement, services, or other relationships with Caviar shall be subject to final and

8

United States District Court
Northern District of California

United States District Court
Northern District of California

1    348, 383 (2014), the California Supreme Court held that such waivers violate public policy and

2    that arbitration clauses containing them are unenforceable.  At the time the Motion to Compel

3    Arbitration was filed, the district courts were split and the Ninth Circuit had not yet ruled on the

4    issue.[2]  After the hearing on this motion, the Ninth Circuit issued Sakkab v. Luxottica Retail N.

5    Am., Inc., __ F.3d __, 2015 WL 5667912, at *11-12 (9th Cir. Sept. 28, 2015), which held that

6    PAGA waivers such as the one contained in the Caviar Courier Terms and Conditions are

7    unenforceable.  Defendant, however, requests that the Court stay any decision on the

8    enforceability of the PAGA waiver until all appeals have been exhausted in the Sakkab case, while

9    allowing the individual, claims to go forward in arbitration. Defendant notes that the defendants in

10   Sakkab have been given until November 11, 2015 to seek rehearing or rehearing en banc of the

11   panel's ruling and estimates that any decision whether to vacate the panel decision pending en

12   banc review will likely not occur until year's end.  Dkt. 41, at 1.

13       The general rule regarding the issuance of a stay while other proceedings bearing on issues

14   in the case are litigated is as follows:

15           The district court's "power to stay proceedings is incidental to the
             power inherent in every court to control the disposition of the causes

16

17   _____

18   binding arbitration before the American Arbitration Association "). Such arbitration shall be
     conducted before a single, neutral arbitrator, pursuant to the applicable AAA rules but provide for
     discovery and remedies which would otherwise be available under applicable state or federal law.

19   Such arbitration shall be conducted within the court jurisdiction within which the Courier
     primarily provides services to Caviar. Caviar shall pay for any arbitration fees, except that Courier

20   shall pay that portion of the arbitration filing fee which is equal to or less than the amount charged
     by applicable state court for filing a civil complaint. Each party shall pay their own attorneys'

21   fees incurred in the arbitration, except as provided by applicable state or federal law. Courier and
     Caviar agree that neither will bring any action on behalf of any party other than themselves, and

22   specifically will bring no collective or class action against each other. This clause expressly
     precludes Courier and Caviar from bringing a civil court action against the other party on behalf of

23   themselves or any other person or entity, except where immediate injunctive relief is necessary to
     protect property or safety.  Velasquez Decl., Exh. C.

24   [2]     Compare Hernandez v. DMSI Staffing, 2015 WL 458083, *6 (N.D. Cal. Feb. 3, 2015),
     Mohamed v. Uber Technologies, Inc., 2015 WL 3749716, *23 (N.D. Cal. June 9, 2015) and

25   Zenelaj, 2015 WL 971320, *8 (N.D. Cal. Mar. 3, 2015) with Fardig v. Hobby Lobby Stores, Inc.,
     2014 WL 4782618, at *4 (C.D.Cal. Aug.11, 2014), Langston v. 20/20 Cos., Inc., 2014 WL

26   5335734, at *7 (C.D.Cal. Oct.17, 2014); Mill v. Kmart Corp., 2014 WL 6706017, at *7 (N.D.Cal.
     Nov.26, 2014); Ortiz v. Hobby Lobby Stores, Inc., 52 F.Supp.3d 1070, 1083–86 (E.D.Cal. Oct. 1,

27   2014); Chico v. Hilton Worldwide, Inc., 2014 WL 5088240, at *12–13 (C.D.Cal. Oct.7, 2014);
     Eubank v. Terminix Int'l, Inc., 2015 WL 4487257, at *8.

28

1

2

3

4

5

6

> on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). Using this power, one case may be stayed in favor of another. Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863–64 (9th Cir.1997) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.").

7

8

9

In order to issue a stay, courts consider: (1) "the possible damage which may result from the granting of a stay," (2) "the hardship or inequity which a party may suffer in being required to go forward," and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."

10

11

CMAX, Inc. v. Hall, 300 F.2d 265, 268 (9th Cir.1962) (citing Landis, 299 U.S. at 254–55). Whether to grant a stay is a matter entrusted to the discretion of the district court. See Landis, 299

12

13

U.S. at 254 ("How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

14

15

When weighing the relevant interests, the court must be mindful that "if there is even a fair possibility that the stay for which he prays will work damage to some one else," the moving party

16

17

"must make out a clear case of hardship or inequity in being required to go forward." Id. at 255. Indeed, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while

18

19

a litigant in another settles the rule of law that will define the rights of both." Id. Moreover, the moving party must show more than the inherent inconvenience arising from involvement in

20

21

litigation. "[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of Landis." Lockyer v. Mirant Corp., 398 F.3d 1098,

22

23

1112 (9th Cir.2005); Klein v. Cook, 2015 WL 2454056, at *2 (N.D. Cal. May 22, 2015).

24

The precondition for a Landis stay is the existence of "independent proceedings" that have not yet been resolved that have some bearing on a pending case. Here, a decision has been issued.

25

26

On balance, the possibility that an en banc hearing may be held is not sufficient grounds on which to defer ruling on this issue. Moreover, Defendant is not merely seeking a stay pending the

27

28

outcome of any en banc proceeding, but a stay "until all appeals have been exhausted," which

United States District Court
Northern District of California

10

1    would involve an even lengthier delay in ruling.  Defendant does not point to any specific

2    "hardship or inequity" that would result from proceeding.  Accordingly, the Court will rely on

3    Sakkab.

             **C.      Clickwrap Agreement**

5           The parties agree that the Courier Terms and Conditions is a "clickwrap agreement."

6    Plaintiff contends that the "clickwrap" arbitration agreement is entirely unenforceable on two

7    grounds.  First, he claims that the agreement is an unenforceable contract because Defendant

8    "failed to display its terms and conditions on the same screen where the couriers had to click to

9    accept the agreement" and also failed to track whether couriers even viewed these terms.  Opp'n at

10   22.  Second, he argues that the clickwrap agreement is procedurally and substantively

11   unconscionable and therefore the arbitration agreement contained in it is unenforceable.

             **1.      Contract Formation**

13          Plaintiff states that the agreement to arbitrate was presented to him on his smartphone

14   when he was "prompted to 'Become Available' but w[as] only informed in tiny fine print on . . .

15   screen[]that "[b]y marking yourself available you agree to Caviar's Courier terms of service,"

16   which only became visible upon clicking a hyperlink. He contends that Defendant should have

17   displayed these terms and conditions on the same screen couriers saw initially in order to create a

18   binding contract.

19          Defendant responds that the cases on which Plaintiff relies in arguing that the clickwrap

20   agreement is unenforceable are from districts other than this one as well as from the Massachusetts

21   state court.[3]  Considerable recent authority from this district finds agreements such as the one here

22   enforceable.  See Mohamed v. Uber Techs., Inc., 2015 WL 3749716 (N.D. Cal. June 9, 2015);

23   Tompkins v. 23andMe, Inc., 2014 WL 2903752 (N.D. Cal. June 25, 2014); Swift v. Zynga Game

United States District Court
Northern District of California

---

3     These cases are as follows:  Grosvenor v. Qwest Communications Int'l, Inc., 2010 WL 3906253, *2 (D.Colo. Sept. 30, 2010); Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., 2011 WL 5825979, *4 (D.N.J. Nov. 16, 2011); Harris v. comScore, Inc., 825 F.Supp.2d 924, 927 (N.D. Ill. 2011); Hines v. Overstock.com, Inc., 668 F.Supp.2d 362, 367 (E.D.N.Y. 2009); Ajemian v. Yahoo!, Inc., 83 Mass.App.Ct 565, 575 (2013) and Lavitman v. Uber Technologies, Inc., 2015 WL 728187, *3 (Mass. Super. Jan. 26, 2015).  What these cases have in common is the view that a clickthrough agreement may not be enforceable when the details of the agreement are not on the same page as the button that the plaintiff clicked to indicate assent to those terms.

1    Network, Inc., 805 F. Supp. 2d 904 (N.D. Cal. 2011).  These cases found that a contract was

2    formed when the plaintiff clicked on a button to indicate assent to an agreement in which the terms

3    themselves were accessed by hyperlink.  In Tompkins, the court held that "[t]he fact that the

4    [contract was] hyperlinked and not presented on the same screen does not mean that [users] lacked

5    adequate notice" of the contract terms.  Tompkins, 2014 WL 2903752 at *8.  Further "courts have

6    long upheld contracts where 'the consumer is prompted to examine terms of sale that are located

7    somewhere else.'" Id.  Tompkins relied on Fteja v. Facebook, 841 F. Supp. 2d 829, 839 (S.D.N.Y.

8    2012) and Swift v. Zynga Game Network, Inc., 805 F.Supp.2d 904, 911–12 (N.D.Cal.2011),

9    which enforced agreements that gave the plaintiff a chance to review the terms of service via

10   hyperlink. These decisions are more persuasive.

11          With regard to Plaintiff's argument that Defendant did not display its terms and conditions

12   on the same screen couriers use to accept the agreement, Defendant has provided evidence that

13   Plaintiff clicked "Become Available" 14 times, which disposes of this contention.  See Reiss Decl.

14   ¶¶ 9-12.  In Tompkins, 2014 WL 2903752 at *7, the court observed that that the plaintiffs did not

15   dispute that users of a website were required to indicate acceptance of the terms of service before

16   being able to use the site and, therefore, the Plaintiffs, who alleged they used the cite, must have

17   clicked "I ACCEPT THE TERMS OF SERVICE."   The court also observed that:

> Other courts have found that user access to portions of websites that
> require indicating assent to be sufficient evidence that the user
> clicked "I Accept." See Feldman v. Google, Inc., 513 F.Supp.2d
> 229, 237 (E.D.Pa.2007) ("Clicking 'Continue' without clicking the
> 'Yes' button would have returned the user to the same webpage. If
> the user did not agree to all of the terms, he could not have activated
> his account, placed ads, or incurred charges."). Thus, Plaintiffs
> cannot credibly claim ignorance as to whether they actually clicked
> the appropriate checkboxes.

23          **2.      Unconscionability**

24          Plaintiff also claims that the arbitration agreement is unenforceable because it is

25   procedurally and substantively unconscionable.

26                          **a.      Procedural Unconscionability**

27          "Procedural unconscionability concerns the manner in which the contract was negotiated

28   and the respective circumstances of the parties at that time, focusing on the level of oppression and

United States District Court
Northern District of California

12

1    surprise involved in the agreement." Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 922 (9th

2    Cir. 2013).  "Oppression addresses the weaker party's absence of choice and unequal bargaining

3    power that results in "no real negotiation." Id.  "Surprise involves the extent to which the contract

4    clearly discloses its terms as well as the reasonable expectations of the weaker party." Id.

5         The arbitration agreement, which is clearly a contract of adhesion, is procedurally

6    unconscionable. See Pokorny v. Quixtar, Inc., 601 F.3d 987, 996 (9th Cir. 2010) (quoting Ting v.

7    AT&T, 319 F.3d 1126, 1148 (9th Cir. 2003)) ("contract is procedurally unconscionable under

8    California law if it is 'a standardized contract, drafted by the party of superior bargaining strength,

9    that relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'");

10   Aral v. EarthLink, Inc., 134 Cal. App. 4th 544, 557 (2005) (holding that clickwrap agreements on

11   a take it or leave it basis are procedurally unconscionable); Merkin v. Vonage Am. Inc., 2014 WL

12   457942, at *6 (C.D. Cal. Feb. 3, 2014) ("Such 'take-it-or-leave-it' contracts of adhesion are

13   frequently found to be oppressive under California law.").  Also, if Plaintiff is considered an

14   employee rather than an independent contractor, then his agreement was a condition of

15   employment, which adds an additional degree of procedural unconscionability. See e.g., Laughlin

16   v. VMware, Inc., 2012 WL 298230, at *5 (N.D. Cal. Feb. 1, 2012) ("Accordingly, because the

17   Employment Agreement is an adhesion contract imposed by Defendants as a condition of

18   employment without providing Plaintiff an opportunity to negotiate or refuse to sign the

19   agreement, the court finds that it is procedurally unconscionable.")

### b.        Substantive Unconscionability

21        The fact that the arbitration agreement is, to some degree, procedurally unconscionable is

22   not the end of the analysis.  The agreement meets the five minimum requirements set out by the

23   court in Armendariz, 24 Cal. 4th at 113-14, in determining whether an arbitration agreement is

24   lawful.  Those requirements are that an arbitration agreement "(1) provides for neutral arbitrators,

25   (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of

26   the types of relief that would otherwise be available in court, and (5) does not require employees

27   to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the

28   arbitration forum." Id. at 102.  All are present here. Velasquez Decl. Ex. C ¶15.5 .

1    Plaintiff does not dispute this point.   Rather, Plaintiff argues that if the PAGA claim is

2    unenforceable, the entire arbitration agreement is substantively unconscionable and therefore void.

3    Defendant counters that the Courier Terms and Conditions contains an "unambiguous severability

4    clause" and the Court should, therefore, sever the PAGA waiver from the arbitration agreement.

5              Under California law, "[i]f the court as a matter of law finds [a] contract or any clause of

6    [a] contract to have been unconscionable at the time it was made the court may refuse to enforce

7    the contract, or it may enforce the remainder of the contract without the unconscionable clause as

8    to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a).   Though the decision to sever is

9    within the discretion of the court, the preferred course "is to sever the offending term and enforce

10   the balance of the agreement." Dotson v. Amgen, Inc., 181 Cal.App.4th 975, 986 (2010); see also

11   Cal. Civ. Code § 1670.5.   A provision may be severed if it is "collateral" and removal would not

12   "eviscerat[e] the central purpose of the Agreement." Laughlin v. VMware, Inc., 2012 WL

13   298230, at *6 (N.D. Cal. Feb. 1, 2012).   Generally, severance is not ordered if a contract is

14   permeated by unconscionability such that "there is no single provision a court can strike . . . to

15   remove the unconscionable taint from the agreement." Armendariz, 24 Cal. 4th at 124–25.

16   Likewise, if "severance would not serve the interests of justice, which is the 'overarching'

17   consideration in the severability determination," Abramson v. Juniper Networks, Inc., 115 Cal.

18   App. 4th 638, 667 (2004), then the court may refuse to enforce the arbitration agreement in its

19   entirety.

20            Some courts have refused to sever and enforce agreements containing unconscionable

21   terms even where the agreement contained a severance clause. See Reyes v. United Healthcare

22   Servs., Inc., 2014 WL 3926813, at *6 (C.D. Cal. Aug. 11, 2014) (refusing to sever two

23   unconscionable provisions even though arbitration agreement contained a severability provision

24   because court found that it did not have the capacity to cure the unconscionability through

25   severance), Sherwood v. Blue Cross, 2007 WL 2705262, at *5 (E.D. Cal. Sept. 14, 2007) (refusing

26   to sever where the defendant "openly admitted" that the agreement was procedurally

27   unconscionability).   However, those cases involve situations in which arbitration agreements

28   contain a number of unconscionable provisions, or where there was an admission of

14

1   unconscionability.  Plaintiff contends that the arbitration agreement is "permeated" by

2   unconscionability and, accordingly, the entire agreement is unenforceable.  That was the situation

3   in Mohamed, 2015 WL 3749716 at  *22, where the agreement also explicitly contained non-

4   severability language.  The court went on to find that even if the waiver could be severed, the

5   entire arbitration agreement was invalid because "the contract is permeated with a number of

6   additional substantively unconscionable terms."  Id. at *27.  These additional terms, which were

7   barred under California law (specifically, an arbitration fee imposed on the employee, cost-

8   splitting, a confidentiality clause, an intellectual property claim carve out, and a unilateral

9   modification provision) formed the basis for the court's conclusion that the agreement was

10  permeated with unconscionable terms.

11          Here, in contrast, the sole substantively unconscionable element of the Courier Terms and

12  Conditions is the PAGA waiver.  Moreover, the severability clause in the agreement is clear.

13  Therefore, the Court will sever the PAGA waiver from the Courier Terms and Conditions.

14          Defendant argues that if the Court severs the PAGA waiver, it should then compel Plaintiff

15  to arbitrate his individual claims while staying the PAGA representative claim pursuant to the

16  FAA.  In support of this argument, Defendant cites Franco v. Arakelian Enters., Inc., 234 Cal.

17  App. 4th 947, 966 (2015) and Alvarez v. Autozone, Inc., No. 14-cv-2471, Dkt. No. 35 (C.D. Cal.

18  July 8, 2015) (staying PAGA claim pending arbitration of other claims)

19          However, Defendant has not addressed a more basic issue, which is whether the PAGA

20  claim is also arbitrable, in which case it would not be stayed while the individual claims go

21  forward, but would be included with them in the arbitration proceedings.  The Sakkab court

22  pointed out that although the PAGA waiver was not enforceable, the issue of whether the PAGA

23  claim was arbitrable pursuant to the parties' arbitration agreement remained:

24                  We have held that the waiver of Sakkab's representative PAGA
                    claims may not be enforced. It is unclear, however, whether the
25                  parties have agreed to arbitrate such surviving claims or whether
                    they must be litigated instead. Accordingly, we reverse the district
26                  court's order dismissing the FAC, and return the issue to the district
                    court and the parties to decide in the first instance where Sakkab's
27                  representative PAGA claims should be resolved, and to conduct
                    such other proceedings as are consistent with this opinion.
28

15

United States District Court
Northern District of California

1   Sakkab v. Luxottica Retail N. Am., Inc., 2015 WL 5667912, at *11-12.

2       Several cases which have found PAGA waivers unenforceable have addressed the question

3   of whether the parties' arbitration agreement encompasses PAGA claims.  Hernandez v. DMSI

4   Staffing, LLC., 79 F. Supp. 3d 1054, 1067 (N.D. Cal. 2015) noted that:

5           The fact that the waiver provisions of the arbitration clauses at issue
            cannot be enforced to bar PAGA representative claims does not
6           necessarily dictate which forum is proper for their adjudication. The
            arbitration clauses here are ambiguous, because while both
7           provisions broadly extend arbitration to all disputes arising out of or
            related to Plaintiff's employment, the waivers suggest that the parties
8           did not anticipate that PAGA representative claims would be
            arbitrated. See Iskanian, 59 Cal.4th at 391, 173 Cal.Rptr.3d 289, 327
9           P.3d 129 ("The arbitration agreement gives us no basis to assume
            that the parties would prefer to resolve a representative PAGA claim
10          through arbitration.").

11  The court then proceeded as follows:

12          The Court directs the parties to meet and confer regarding their
            views on how to proceed in light of the holdings of this order. The
13          Court will address whether to bifurcate and stay the PAGA matter
            pursuant to 9 U.S.C. § 3 at the next case management conference on
14          March 26, 2015.  To the extent the parties disagree on next steps, the
            parties shall agree on a briefing schedule on their respective
15          interpretations of the DRA [Dispute Resolution Agreement] and
            Ross Arbitration Policy language. Such briefing shall be completed
16          no later than March 12, 2015. If the parties are able to agree on next
            steps through meeting and conferring, the parties shall file a
17          stipulation and proposed order.

18  The court denied the motion to enforce the waiver of the PAGA claims and deferred a decision on

19  bifurcation and stay, while granting the motion as to the plaintiff's individual claims.  Hernandez

20  v. DMSI Staffing, LLC., 79 F. Supp. 3d at 1067-68.

21      In a case in which the arbitration agreement specified that it was governed by AAA rules,

22  the court referred the question of whether the PAGA claims were arbitrable to the arbitrator:

23          In light of the Parties' decision to conduct the resolution of their
            dispute in accordance with the AAA Commercial Rules, the Court
24          leaves the question of arbitrability to be decided by the arbitrator in
            accordance with the clear and unmistakable intent of the Parties as
25          defined by prevailing case law. Additionally, the Court finds that the
            Agreement's waiver of Plaintiffs' statutory right to pursue
26          representative PAGA claims is invalid as a matter of state law.
            However, as with the other causes of action asserted by Plaintiffs,
27          the arbitrability of these representative claims must be decided by an
            arbitrator.
28

16

1 || Zenelaj v. Handybook Inc., 82 F. Supp. 3d 968, 978-79 (N.D. Cal. 2015).

2         The Caviar Courier Terms and Conditions states that "Courier and Caviar agree that any disputes between them arising from Courier's agreement, services, or other relationships with Caviar shall be subject to final and binding arbitration before the American Arbitration Association ("AAA").  Valasquez Decl., Exh. C.  The arbitration agreement in this matter is governed by AAA rules, so it would appear that the Court may refer the issue of the arbitrability of the PAGA claim to the arbitrator.  However, because the parties have not yet addressed this issue, the Court requests that they brief the question of whether the arbitrability of the PAGA claim should be determined by the AAA arbitrator.

V.    **CONCLUSION**

        For the reasons set out above, the Court **GRANTS** the motion to compel arbitration of Plaintiff's individual claims and finds the PAGA waiver unenforceable. Within 14 days of the date this Order is filed, the parties shall each submit letter briefs of no more than five pages on the issue of whether the arbitrability of Plaintiff's PAGA claim should be decided by the AAA arbitrator.

        **IT IS SO ORDERED.**

Dated: November 16, 2015



ELIZABETH D. LAPORTE
United States Magistrate Judge